# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 23, 2023

Lyle W. Cayce
Clerk

———————

No. 21-40750

———————

RICHARD DEVILLIER; WENDY DEVILLIER; STEVEN DEVILLIER;
RHONDA DEVILLIER; BARBARA DEVILLIER; ET AL.,

*Plaintiffs—Appellees*,

*versus*

STATE OF TEXAS,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:20-CV-223
USDC No. 3:20-CV-379
USDC No. 3:21-CV-104
USDC No. 4:21-CV-1521

_____

ON A POLL ON THE COURT'S OWN MOTION

Before HIGGINBOTHAM, SOUTHWICK, and HIGGINSON, *Circuit Judges*.
PER CURIAM:

At the request of one of its members, the court was polled, and a majority did not vote in favor of rehearing (FED. R. APP. P. 35 and 5TH CIR. R. 35).

In the en banc poll, five judges voted in favor of rehearing (Smith,

Elrod, Engelhardt, Oldham, and Wilson), and eleven voted against rehearing (Richman, Jones, Stewart, Southwick, Haynes, Graves, Higginson, Willett, Ho, Duncan, and Douglas).

Patrick E. Higginbotham, *Circuit Judge*, concurring in denial of rehearing en banc:

Property Owners filed suits in Texas state courts claiming that the flooding of their land by the State of Texas constituted a taking under the Takings Clause. The State removed the cases to federal court asserting federal question jurisdiction. The State moved to dismiss the takings claims, arguing that the Fifth Amendment does not create an implied cause of action, the State is immune from monetary liability, and some claims were barred by the limitations period. The district court denied the motion, finding that the Plaintiffs-Property Owners could advance their claims directly under the Takings Clause. The panel disagreed. The Fifth Amendment Takings Clause does not provide a right of action in federal court for takings claims against a state.[1] The pathway for enforcement in takings by the state is rather through the state courts to the Supreme Court. On that passage, the Supreme Court of Texas applies both federal and state law.[2] Its decisions on state law control,

---

[1] *See Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020) ("[A] federal court's authority to recognize a damages remedy must rest at bottom on a statute enacted by Congress."); *Azul–Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992) (holding that a takings plaintiff has "no cause of action directly under the United States Constitution"), *cert. denied*, 506 U.S. 1081 (1993).

[2] The Supreme Court of Texas recognizes takings claims under the federal and state constitutions, with differing remedies and constraints turning on the character and nature of the taking. *See Gutersloh v. Texas*, No. 93-8729, 25 F.3d 1044, 994 WL 261047, *1 (5th Cir. 1994) (unpublished) (per curiam) ("[T]he courts of the State of Texas are open to inverse condemnation damage claims against state agencies on the basis of the Fifth Amendment, as applied to the states through the Fourteenth Amendment, as well as on the basis of the Texas Constitution and laws."); *City of Baytown v. Schrock*, 645 S.W.3d 174, 178 (Tex. 2022) ("Under our [federal and state] constitutions, waiver occurs when the government refuses to acknowledge its intentional taking of private property for public use. A suit based on this waiver is known as an 'inverse condemnation' claim."); *Allodial Ltd. P'ship v. N. Tex. Tollway Auth.*, 176 S.W.3d 680, 683–84 (Tex. App.—Dallas 2005, pet. denied) (noting that Texas courts apply a two-year limitations period to takings claims for "damaged" property and a ten-year limitations period to takings claims for "taken" property).

and Texas state law provides the procedures for fulfilling the State's obligations under the Takings Clause for takings by the state.[3]

In short, the en banc court did not err in rejecting the contention that "self-executing," as used in *Knick*, creates federal jurisdiction and need not find a jurisdictional grant such as 42 U.S.C. § 1983. Nor did the en banc court err in leaving undisturbed the panel's remand to the district judge for further proceedings, which should be understood to include a return to the state courts for their upward trek.[4]

## I.

Takings by the state have been addressed and overseen by state courts throughout our history, with review by state supreme courts and then review by the Supreme Court. It signifies that it is that genre of cases—and not takings by municipalities—that is at issue. As I will explain, this flow of cases is no accident.

The en banc court rejected the contention that the "self-executing" character of the Takings Clause grants direct access to federal courts, and for good reason. It is plain that "self-executing" speaks only to the completeness of the claim itself, the point at which a takings claim is ready for *a* court. Chief Justice Roberts explains:

> Because of "the self-executing character" of the Takings Clause "with respect to compensation," a property owner has

---

[3] *See Knick v. Township of Scott*, 139 S. Ct. 2162, 2170 (2019) ("The Fifth Amendment right to full compensation arises at the time of the taking . . . .").

[4] The Property Owners may yet raise their Takings Clause argument to the Supreme Court, and we granted their motion to stay the mandate to facilitate certiorari.

a constitutional claim for just compensation at the time of the taking.[5]

The completeness of the claim is the sole usage of the term. Its purpose was to retreat from the earlier *Williamson County* doctrine.[6] The Court then explains that the claim can be immediately pursued in the federal courts by 42 U.S.C. § 1983,[7] which by its terms does not reach actions against the state—as distinguished from local governments and municipalities. The Supreme Court was explicit: because takings claims against municipalities can be brought under this provision, it "ha[d] no occasion to consider [the Solicitor General's] "novel [] argument" that state takings claims can be brought directly in federal court pursuant to 28 U.S.C. § 1331.[8] In other words, lifting a term of art from its context—the retreat from *Williamson County*—effectively denies its true meaning.

That § 1983 by its terms does not reach state conduct does not mean that *Knick* left takings by the state without a pathway. To the contrary, *Knick* did not abandon federal review of state takings; it left undisturbed the sole pathway through the state courts with review by the state supreme court and the United States Supreme Court, a process hundreds of years old. Leaving the pathway of state takings to the state courts is a direct response to the unique makeup of takings under the Fifth Amendment: an amalgam of state and federal law. This effectively allows the United States Supreme Court to address state takings when issues of property law are settled by the state

---

[5] *Id.* at 2171 (quoting *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315 (1987)).

[6] *Id.* at 2179.

[7] *Id.* at 2177 ("We conclude that a government violates the Takings Clause when it takes property without compensation, and that a property owner may bring a Fifth Amendment claim under § 1983 at that time.").

[8] *Id.* at 2174 n.5.

supreme court, this because the state supreme court is final on matters of state law.

In turn, this passageway for state takings informs the lower federal courts with takings cases from municipalities and local government entities of the controlling state law defining property rights. Again, this is neither accident nor is it an exhaustion requirement. It is the familiar service of federalism expressed in the choice of routes for review of state actions in their upward path to the Supreme Court.

Casting aside both the utility and the service to federalism of the pathway to the Supreme Court through state courts by granting immediate access into the lower federal courts of state takings would reflect a distrust of the state courts to apply federal law as they are obligated to do.[9] State judges take the same oath to faithfully apply the law as do federal judges, and with all deference to our federal brethren, leaving in place passages to state supreme courts for state takings claims brings the well-equipped eyes of those dealing with state property interests on a daily basis, as they have done all these many years. In sum, the contentions we reject would work a profound upset of state-federal relations. This strained effort to drain state courts of state takings claims as reflected in the procedural gymnastics of this case come with no rational justification. Whatever its fuel, it is without legal foundation.

At present, and for the past 100 years, all but one of the states have met their obligations under the Fifth Amendment to provide procedural

---

[9] *See Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 507 (1962) ("We start with the premise that nothing in the concept of our federal system prevents state courts from enforcing rights created by federal law."); *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990) ("Under [our] system of dual sovereignty, we have consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States."); *Claflin v. Houseman*, 93 U.S. 130, 136 (1876).

pathways for the termination of condemnation cases.[10] As Justice Black reminded us in *Testa v. Katt*, federal law is state law.[11] It is not foreign law.[12] The state courts are thus obligated to follow federal law perforce constitutional law. Here, the Takings Clause, by its own language, charges the states to provide just compensation for takings.[13] Texas did that, providing a pathway through state courts of takings claims both in its constitution and legislation for more than a century.

From the beginning the Fifth Amendment charged the states to provide compensation for its takings to protect the peoples' property. State courts were the enforcers of all claims against the state for all state takings in all but one state. When § 1983 arrived, offered by an act of Congress under the Fourteenth Amendment, it did not provide a right of actions against states. This left in place the pathway to the Supreme Court of takings by the states as distinguished from the pathways of cities and municipalities, a familiar review regime and an extraordinarily large structure nationwide that has operated for over a century. Yet despite any need, our dissenting colleagues seek to gratuitously puncture it. The en banc court refused to do so, and the peoples' property remains fully protected from takings by the government.

If the present effort of this suit is an expression of distrust of state courts, it comes with a large price, both to this Court and to this structure. In

---

[10] And even in Ohio, mandamus provides a remedy. *See Knick*, 139 S. Ct. at 2169.

[11] *See generally* 330 U.S. 386 (1947); *see also Claflin*, 93 U.S. at 136 ("The laws of the United States are laws in the several States, and just as much binding on the citizens and courts thereof as the State laws are.").

[12] *See Claflin*, 93 U.S. at 136 (noting that "[t]he United States is not a foreign sovereignty as regards the several States").

[13] U.S. CONST. amend. V ("Nor shall private property be taken for public use, without just compensation.").

short, no case has been made for rerouting state takings to the lower federal courts, bypassing the superintendence of the state supreme courts who share their responsibility for the last word on state law with the United States Supreme Court's final word on their federal component. So, our question is, what is the need? There simply is no rational reason to disturb the procedural paths of this genre of cases. It is in place and working effectively, as it has throughout our history. To do so would upset the structures of all but one of the states in the union, a pristine exemplar of federalism—not just a political slogan, but the heart of our splitting of the atom of sovereignty.

We have a Congress. It wrote § 1983. It can accomplish what is proposed, but it is telling that it has not. This move is above our paygrade.

Stephen A. Higginson, *Circuit Judge*, concurring in denial of rehearing en banc:

This case is about whether there is an implied cause of action in the Fifth and Fourteenth Amendments for claims that "due process of law . . . requires compensation to be made . . . to the owner of private property taken for public use under the authority of a state." *Chi., B. & Q.R. Co. v. City of Chi.*, 166 U.S. 226, 235 (1897). Because implying constitutional causes of action is "a disfavored judicial activity," *Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022) (citation omitted), and because implying such a cause of action here would infringe separation-of-powers principles, I concur in denial of rehearing en banc.

Three terms ago, in *Maine Community Health Options v. United States*, every Justice agreed that "the Constitution did not expressly create a right of action when it mandated just compensation for Government takings of private property for public use." 140 S. Ct. 1308, 1328 n.12 (2020) (cleaned up); *see id.* at 1334 & n.3 (Alito, J., dissenting). It follows that any cause of action in the Takings Clause to sue the federal government for just compensation, if it exists, is implied.

Eight of the Justices who decided *Maine Community Health Options* appear to have assumed that the Takings Clause creates an implied cause of action to sue the United States. Those Justices pointed out that property owners can bring takings claims against the United States "through the Tucker Act," which "waive[s] immunity for certain damages suits in the Court of Federal Claims" but "does not create substantive rights." *Me. Cmty. Health Options*, 140 S. Ct. at 1327, 1328 n.12 (cleaned up); *see* 28 U.S.C. § 1491. Thus, a plaintiff relying on the Tucker Act's immunity waiver must identify a claim "in some other source of law, such as the Constitution." *United States v. Mitchell*, 463 U.S. 206, 216 (1983) (cleaned up). To establish

such a claim, the plaintiff "must demonstrate that the source of substantive law . . . can be fairly interpreted as mandating compensation by the Federal Government for the damages sustained," *id.* at 216-17 (cleaned up), either "expressly or by implication," *id.* at 217 n.16 (citation omitted). Applying those principles, *Maine Community Health Options* suggested that the Takings Clause impliedly creates a cognizable claim under the Tucker Act because the Takings Clause imposes "a mandatory . . . obligation to pay" on the United States. 140 S. Ct. at 1328 n.12; *see United States v. Causby*, 328 U.S. 267 (1946) (holding that "[i]f there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine").

So, if the Fifth Amendment had applied directly to the states at the Founding, this might be a straightforward case. But the Takings Clause is incorporated against the states through the Due Process Clause of the Fourteenth Amendment. *See Chi., B. & Q.R. Co.*, 166 U.S. at 235. The question before us, then, is whether the Due Process Clause of the Fourteenth Amendment "made applicable to the States" an implied cause of action against the federal government, along with the rest of the Takings Clause. *Dolan v. City of Tigard*, 512 U.S. 374, 383 (1994).

One answer to the incorporation dilemma is the proposition that an implied cause of action, if it exists, would be part of the property owner's "irrevocable right to just compensation . . . upon a taking." *Knick v. Township of Scott*, 139 S. Ct. 2162, 2172 (2019). Accordingly, when the substantive right guaranteed by the Takings Clause was incorporated against the states, so was a corresponding implied cause of action against the states, or so the argument goes. This line of reasoning appears to follow the "well-established rule that incorporated Bill of Rights protections apply identically to the States and the Federal Government." *McDonald v. City of Chi.*, 561 U.S. 742, 766 n.14 (2010).

However, that theory assumes that an implied cause of action against the federal government for takings claims is intrinsic to the property owner's right to just compensation as opposed to a distinct right that would require separate incorporation against the states. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1405 n.63 (2020) ("The scope of an incorporated right and whether a right is incorporated at all are two different questions."). Since a cause of action against the federal government is not express in the Fifth Amendment, *see Me. Cmty. Health Options*, 140 S. Ct. at 1328 n.12, if such a cause of action exists, it must be "judicially created," *Egbert*, 142 S. Ct. at 1802.[1] And it is not obvious why a cause of action fashioned by judges—not the Constitution—would be coextensive with a substantive constitutional right such that incorporation of one would incorporate the other. Nor is it obvious that a judicially created cause of action is always or ever a constitutional right that can be incorporated through the Fourteenth Amendment.[2]

There is at least one other reason to think that a judicially created cause of action to enforce the Takings Clause, separate and distinct from the right to just compensation, was *not* automatically incorporated against the states along with the substantive right. The Takings Clause is "*enforced against the States under the Fourteenth Amendment* according to the same

---

[1] It may be that an implied cause of action against the federal government in the Takings Clause is not "implied" as that term has been used in the Supreme Court's post-*Bivens* decisions. *See, e.g.*, *Egbert*, 142 S. Ct. at 1802. After all, unlike other provisions in the Bill of Rights, the Takings Clause refers to "compensation," and the Supreme Court has explained that under the Takings Clause, "the compensation remedy is required by the Constitution," *First English Evangelical Luther Church of Glendale v. L.A. Cnty.*, 482 U.S. 304, 316 (1987). But I take the *Maine Community Health Options* dictum at its word—the reference to compensation in the Takings Clause does not create an express constitutional cause of action—and so some kind of judicial genesis seems necessary to bring the remedy into being.

[2] Otherwise, why not say that the causes of action implied in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and *Carlson v. Green*, 446 U.S. 14 (1980), were incorporated along with the Fourth and Eighth Amendments?

*standards* that protect . . . against federal encroachment." *Malloy v. Hogan*, 378 U.S. 1, 10 (1964) (emphasis added); *see McDonald v. City of Chi.*, 561 U.S. 742, 765 (2010). Accordingly, while a property owner has the same "irrevocable right to just compensation immediately upon a taking" by a state as by the federal government, *Knick*, 139 S. Ct. at 2172, the enforcement of that right against a state is contingent on the Due Process Clause. For a takings claim against a state to be "under the Fourteenth Amendment" in more than name only, *Malloy*, 378 U.S. at 10, the relevant cause of action would presumably need to be implied in the Due Process Clause as well.[3]

The upshot of this analysis is that an implied cause of action for takings claims against states has not been incorporated by the Due Process Clause of the Fourteenth Amendment and therefore would need to be independently implied from the constitutional text. "When a party seeks to assert an implied cause of action under the Constitution itself . . . [t]he question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017) (citation omitted). We will not recognize an implied constitutional cause of action if

---

[3] In *Mapp v. Ohio*, the Court noted that the federal exclusionary rule was "judicially implied" but applied it to the states because the Court understood it as "of constitutional origin," "an essential part of the right of privacy," and "an essential part of . . . [the] Fourteenth Amendment[]." 367 U.S. 643, 648, 657 (1961). Later, the Court recognized that the rule "is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Calandra*, 414 U.S. 338, 348 (1974); *see Davis v. United States*, 564 U.S. 229, 237-38 (2011). It is not entirely clear whether, under modern incorporation doctrine and this modern understanding of the exclusionary rule, *Mapp* would have been decided differently. *Cf. McDonald*, 561 U.S. at 785 ("Although the exclusionary rule is not an individual right but a judicially created rule, this Court made the rule applicable to the States" (cleaned up)). In any event, *Mapp* did pass on whether the implied "sanction of exclusion" was an essential part of the Due Process Clause of the Fourteenth Amendment. *Mapp*, 367 U.S. at 655. To perform the same analysis with respect to an implied *cause of action* against the states may trigger the separation-of-powers inquiry that the Court has said controls the implication of constitutional causes of action. *See Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017).

"there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert*, 142 S. Ct. at 1803.

There are four warning signs that this court would "arrogate legislative power" by implying a cause of action against the states in the Takings Clause of the Fifth Amendment as incorporated by the Due Process Clause of the Fourteenth Amendment. *Egbert*, 142 S. Ct. at 1803 (cleaned up). An alternative remedial structure already exists in state inverse-condemnation law. *See Ziglar*, 137 S. Ct. at 1858 (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 73-74 (2001) (state tort law)); *Minneci v. Pollard*, 565 U.S. 118, 129 (2012) (state tort law). In 42 U.S.C. § 1983, Congress decided to provide a damages remedy for takings claims against municipalities and certain local government units, *see Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 & n.54 (1978), but not states, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). Implying a judicial remedy against states implicates federalism, and the elected legislative branch is better equipped to balance federal and state interests in this area than our court. And we "cannot predict the systemwide consequences of recognizing a cause of action" under the Fifth and Fourteenth Amendments for takings claims against states. *Egbert*, 142 S. Ct. at 1803 (cleaned up).

The dissent does not grapple with the incorporation dilemma or justify implying a cause of action in the Fifth and Fourteenth Amendments. *See Me. Cmty. Health Options*, 140 S. Ct. at 1328 n.12 (2020) ("[T]he Constitution did not expressly create a right of action when it mandated just compensation for Government takings of private property for public use."). Instead of offering a theory of incorporation or implication, the dissent contends that federal courts have long entertained takings claims against states, invokes cases where "[t]he Court affirmed the self-executing nature of the Fifth Amendment," and identifies *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304 (1987), as a case where

the Supreme Court held that a statutory cause of action is not required to recover just compensation under the Takings Clause. But the dissent's authorities fall short of supporting its argument.

First, the dissent invokes pre-incorporation cases where federal courts considered takings claims against states. However, as the dissent notes, Congress had provided a jurisdictional basis for federal courts to hear state-law takings causes of action pre-incorporation. So those cases don't illuminate whether the Due Process Clause of the Fourteenth Amendment incorporated an implied cause of action for takings claims against states or whether the cause of action should be implied now.

Second, the dissent relies on post-incorporation cases adjudicating takings claims against municipalities, not states. *See Vill. of Norwood v. Baker*, 172 U.S. 269 (1898); *Cuyahoga River Power Co. v. City of Akron*, 240 U.S. 462 (1916); *Del., L. & W.R. Co. v. Town of Morristown*, 276 U.S. 182 (1928); *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926).[4] These claims today could be brought under § 1983, and at most, these cases support an inference that a cause of action exists against local governments. Regardless, these cases may have simply "assumed without . . . deciding" "[t]he question whether a cause of action exists," because absence of a cause of action is not a jurisdictional issue. *Burks v. Lasker*, 441 U.S. 471, 476 n.5 (1979).

Even if these older cases did assume without deciding that an implied cause of action existed, that's unsurprising because the Supreme Court's more recent decisions have cast aside the method of finding causes of action

---

[4] One exception is *Dohany v. Rogers*, which was an early twentieth-century suit "to enjoin the state highway commissioner and others from acquiring a right of way . . . and from prosecuting a proceeding in the state courts for the acquisition of the right of way . . . on the ground that the state statutes under which the proceeding was had infringed the State Constitution and the Fourteenth Amendment." 281 U.S. 362, 363 (1930). *Dohany* did not adjudicate a takings claim for compensation against a state.

in the Constitution where Congress is silent and an alternative remedial framework exists. *See Egbert*, 142 S. Ct. at 1803; *Ziglar*, 137 S. Ct. at 1854. And a procedural vehicle exists in every state's law to enforce takings claims.[5] *See Knick*, 139 S. Ct at 2168 & n.1.

Next, the dissent says that the Supreme Court has "affirmed the self-executing nature of the Fifth Amendment again and again throughout the twentieth century." But the dissent does not and cannot maintain that these cases implied a cause of action against the states in the Fifth and Fourteenth Amendments. With two exceptions, the cases that the dissent cites did not involve claims against states or present the question of whether an implied federal constitutional cause of action exists against states. *See Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1 (1984); *United States v. Clarke*, 445 U.S. 253 (1980); *United States v. Dickinson*, 331 U.S. 745 (1947); *United States v. Causby*, 328 U.S. 256 (1946); *Jacobs v. United States*, 290 U.S. 13 (1933). And neither of the cases that did arguably raise the issue— *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304 (1987), and *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019)—resolved it.

---

[5] Relying on a proposed amicus brief submitted in this case, the dissent argues that Louisiana "does not afford its citizens a state-law takings remedy." To support this assertion, the amicus, in turn, seems to rely on our recent decision in *Ariyan, Inc. v. Sewerage & Water Board of New Orleans*, 29 F.4th 226 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 353 (2022). There, the plaintiffs had won final judgments for violations of Louisiana law against the Board in state court, but the Board failed to satisfy those judgments. *See id.* at 228-29, 231-32. So the plaintiffs filed a § 1983 suit alleging that the Board's failure to timely pay just compensation once the compensation had been awarded violated the Takings Clause. *See id.* at 229. We held that plaintiffs had failed to state a claim for a violation of the Takings Clause because "there is no property right to timely payment on a judgment" awarded for a state-law claim. *Id.* at 228. But *Ariyan* isn't the end of the story for plaintiffs bringing takings claims against Louisiana state governmental entities. *Ariyan* did not decide that a state's refusal to pay just compensation for a federal takings claims would be constitutional under the Fifth Amendment requirement of a just compensation remedy, *see First English*, 482 U.S. at 316. Nor did *Ariyan* hold that it would be constitutional for a state to refuse to pay a judgment for a state-law takings claim where the plaintiff had no procedural vehicle to bring a federal takings claim. Those issues remain live after *Ariyan*.

In *First English*, the petitioner had sued in state court alleging that a County ordinance denied it "all use of" its property. *Id.* at 308. The complaint "invoked only the California Constitution," *id.* at 313 n.8, and sought damages for the lost use of the property, *id.* at 308. But under a California Supreme Court decision, *Agins v. Tiburon*, 598 P.2d 25 (Cal. 1979), "compensation [was] not required until the challenged regulation or ordinance has been held excessive in an action for declaratory relief or a writ of mandamus and the government has nevertheless decided to continue the regulation in effect," *First English*, 482 U.S. at 308-09. Relying on *Agins*, the state trial court struck First English's allegation that the ordinance denied it all use of its property. *Id.* at 309. In affirming the trial court, the state intermediate court of appeals followed *Agins* "because the United States Supreme Court ha[d] not yet ruled on the question of whether a state may constitutionally limit the remedy for a taking to nonmonetary relief." *Id.* (citation omitted). The California Supreme Court denied review. *Id.* The Supreme Court reversed, "merely hold[ing] that where the government′s activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." *Id.* at 321.

Before reaching the merits, the Court addressed several challenges to the Court's jurisdiction that the County raised, including that First English "failed to preserve for review any claim under federal law." *Id.* at 313 n.8. After all, First English's complaint didn't raise any federal claims. *Id.* But First English had argued in the state appellate court that the *Agins* rule was unconstitutional, and the state appellate court applied *Agins* to dismiss the action nonetheless. *Id.* Because the state appellate court "rejected on the merits the claim that the [*Agins*] rule violated the United States Constitution," the state court "considered and decided the constitutional claim" that the ordinance violated the federal Takings Clause by failing to

provide just compensation. *Id.* On this basis, the Court found that it had appellate and certiorari jurisdiction. *Id.*

The United States filed an amicus brief in support of the County. The United States acknowledged that "a temporary taking of property is clearly within the constitutional proscription that private property shall not be taken for public use without just compensation." Brief for the United States as Amicus Curiae Supporting Appellee, *First English*, 482 U.S. 304 (No. 85-1199), 1986 WL 727420, at *11. But the United States argued that neither the Fifth Amendment nor Fourteenth Amendment, "of its own force, furnish[es] a basis for a court to award money damages against the government." *Id.* at *14. In defending this contention, the United States claimed that "the Takings Clause is strictly prohibitory and does not, without further legislative action, mandate a monetary award against the government," and made a similar argument with respect to the Fourteenth Amendment. *Id.* at *14, *26-*30. The United States also noted that § 1983 provides a statutory remedy upon which First English had not relied in state court or the Supreme Court. *See id.* at *30-*32. Collectively, these arguments attacked the core of First English's position—that the Fifth Amendment requires compensation as a remedy for "temporary" regulatory takings. *First English*, 482 U.S. at 310.

Even assuming that the United States "squarely presented" the Supreme Court "with the question . . . whether [§ 1983] is an indispensable prerequisite for recovering just compensation," as the dissent asserts, the Court treated the United States' arguments as a challenge to First English's merits theory. *See First English*, 482 U.S. at 316 n.9 (merits section of opinion). And all the Court said in response was that the United States was wrong that "the Fifth Amendment, combined with principles of sovereign immunity, establishes that the Amendment itself is only a limitation on the power of the Government to act, not a remedial provision," and that "the

Constitution does not, of its own force, furnish a basis for a court to award money damages against the government." *Id.* (citations omitted). Rather, "the Constitution . . . dictates the remedy for interference with property rights amounting to a taking." *Id.* This is essentially what the Court eventually held as to the ultimate issue in the case: "invalidation of the ordinance without payment of fair value for the use of the property . . . would be a constitutionally insufficient remedy." *Id.* at 322. So the Court did not silently hold that there is an implied cause of action against the states in the Fifth and Fourteenth Amendments. It certainly did not do so by directing future readers to seek out the United States' amicus brief as a guide to interpreting the holding of the case.

*Knick* doesn't resolve the issue, either. There, the Court held that a "property owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court *under § 1983* at that time." 139 S. Ct. at 2168 (emphasis added). It is difficult to understand why the Court would have emphasized that § 1983 provides the mechanism to bring takings claims if § 1983 is not a necessary ingredient for the suit. Therefore, *Knick* only shows that the dissent's approach would undermine the scheme Congress has set forth to enforce the Takings Clause.

In short, we have long outgrown the "*ancien regime* that freely implied rights of action." *Oliva v. Nivar*, 973 F.3d 438, 442 (5th Cir. 2020) (cleaned up); *Cantú v. Moody*, 933 F.3d 414, 421 (5th Cir. 2019) (similar). This case, I ultimately conclude, is no exception. Accordingly, I concur in the denial of rehearing en banc.

Andrew S. Oldham, *Circuit Judge*, joined by Smith, Elrod, Engelhardt, and Wilson, *Circuit Judges*, dissenting from the denial of rehearing en banc:

The panel decision renders federal takings claims non-cognizable in state or federal court. This breaks with centuries of precedent. And the panel did it in a one-paragraph decision with one sentence of analysis. The panel's sources for this remarkable holding? A *Bivens* case and a 1992 Ninth Circuit decision. No matter what one thinks about the merits of this question, it plainly requires more explanation than that.

In two concurring opinions respecting the denial of en banc rehearing, two members of the panel purport to provide the reasoning that the published panel opinion did not. And both of my esteemed colleagues say this appeal is much ado about nothing because plaintiffs are free to litigate their federal takings claims in state court.

Wrong. Plaintiffs already tried that, but the State removed the cases. And rather than ordering the case remanded to state court, the panel held that plaintiffs' claims "arise under" federal law for removal purposes but "arise under" state law for merits purposes. Based on that deeply wrong misstep, the panel then adjudicated plaintiffs' federal takings claims *on the merits*. *Finis. Res judicata.* The case is now over, barring Supreme Court intervention. And not just for these plaintiffs. The panel decision is an insuperable obstacle to any plaintiff asserting any federal takings claim against any State in federal *or state* court. If this case is not enbancworthy, then it's unclear how any case ever will be.

I.

The plaintiffs are 72 individuals, one corporation, and four limited liability companies who own property on the north side of Interstate Highway 10 ("IH-10") in Chambers County, Texas. Plaintiffs originally filed four

separate actions in Texas state court. They alleged that their properties were "inundated, destroyed, and/or damaged as a result of the affirmative actions of the State [of Texas] in designing, constructing, operating, and/or maintaining IH-10." ROA.1176. Specifically, plaintiffs alleged that the State constructed an impenetrable concrete barrier along the interstate for purposes of storing stormwater on plaintiffs' private property without their consent or compensation in violation of both the Texas and U.S. Constitutions. The concrete barrier looks like this:



Plaintiffs alleged that the concrete barrier created a dam that barricaded rainfall from flowing into the Gulf of Mexico and instead flooded plaintiffs' properties:



Plaintiffs alleged the State thus took their property without just compensation. *See, e.g.*, *Pumpelly v. Green Bay & Miss. Canal Co.*, 80 U.S. (13 Wall.) 166 (1871) (creation of a dam that flooded plaintiff's property constituted compensable taking); *United States v. Dickinson*, 331 U.S. 745

(1947) (same); *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012) (even temporary floods caused by government can constitute compensable takings).

The State of Texas removed all four actions to federal court under 28 U.S.C. § 1441. The United States District Court for the Southern District of Texas consolidated the four cases. Plaintiffs then filed a "First Amended Master Complaint," which is the live pleading in this case. Plaintiffs raised four claims: (1) an unconstitutional taking without just compensation under Article I, § 17 of the Texas Constitution; (2) an unconstitutional taking without just compensation under the Fifth Amendment's Takings Clause, as incorporated against the States by the Fourteenth Amendment; (3) deprivation of a property without procedural due process under the Fourteenth Amendment; and (4) deprivation of a property without substantive due process under the Fourteenth Amendment. Plaintiffs sought damages, as well as declaratory and injunctive relief.

The State then moved to dismiss (1) the state-law takings claim and (2) the federal takings claim. Regarding the federal claim, the State argued that "42 U.S.C. § 1983 is the only vehicle by which a constitutional violation can be alleged." ROA.1204–05. Because the State is not a "person" amenable to suit under § 1983, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), the State argued that it can never be amenable to a federal taking claim in federal court. ROA.1205–06. The State also argued that it enjoys sovereign immunity against federal takings claims—even after the State chose to remove the case to federal court.

The magistrate judge recommended denying the State's motion in a powerful and incisive opinion. The magistrate judge (correctly) noted: "This thinking [by the State] eviscerates hundreds of years of Constitutional law in one fell swoop, and flies in the face of commonsense. It is pretzel logic."

ROA.1279. The district court agreed with the magistrate judge and adopted the report and recommendation. Then the district court certified its order for interlocutory review under 28 U.S.C. § 1292(b).

We accepted the certification and vacated the district court's order. The panel decision is one paragraph long. In one sentence, the panel dispensed with plaintiffs' federal claim: "Because we hold that the Fifth Amendment Takings Clause as applied to the [S]tates through the Fourteenth Amendment does not provide a right of action for takings claims against a [S]tate, we VACATE the district court's decision for want of jurisdiction and REMAND with instructions to return this case to the state courts." *Devillier v. Texas*, No. 21-40750, 2022 U.S. App. LEXIS 32519, at *1 (5th Cir. Nov. 23, 2022) (per curiam).

That sentence is plainly wrong for a host of reasons. First and foremost, the absence of a cause of action is a merits problem, not a jurisdictional one. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case."); *Bell v. Hood*, 327 U.S. 678, 682 (1946) ("Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover."); 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350 (3d ed. Apr. 2022 update) [WRIGHT & MILLER] ("Nor, as many courts have noted, should a motion under Rule 12(b)(1) be confused with a motion under Rule 12(b)(6) to dismiss for failure to state a claim for relief under federal or state law because the two are analytically different; as many courts have observed, the former determines whether the plaintiff has a right to be in the particular court and the latter is an adjudication as to whether a cognizable legal claim has been stated.").

Second, the panel apparently forgot that the case came to us on a § 1292(b) certification and that other federal claims remained pending in the district court, so "this case" could not be "return[ed] . . . to the state courts." *Devillier*, 2022 U.S. App. LEXIS 32519, at *1.

Third, rather than discussing any of the Supreme Court's decisions under the Takings Clause, the panel's only support for its assertion was a footnote reference to two unrelated cases: The Supreme Court's most recent *Bivens* decision, *Hernandez v. Mesa*, 140 S. Ct. 735 (2020), and the Ninth Circuit's aged decision in *Azul–Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704 (9th Cir. 1992).

Fourth, one-paragraph opinions with one-sentence explanations are usually reserved for our summary calendar, not pathbreaking constitutional rulings depriving property owners of any forum, state or federal, for claims under centuries-old constitutional provisions.

Both sides pointed out these and other errors in cross-petitions for rehearing. And the Institute for Justice filed a motion for leave to file an amicus brief supporting rehearing en banc because "the Panel failed to discuss or even mention the line of Supreme Court cases establishing, repeatedly and clearly, that the Fifth Amendment's Takings Clause is self-executing and needs no statutory recognition." IJ Amicus at 2. The putative amicus also argued:

> [T]he Panel's holding has immense practical ramifications for this Circuit in particular. Regardless of whether Texas allows its courts to hear and enforce takings claims against state entities, Louisiana does not. The holding below, unless corrected, leaves property owners in Louisiana without any vehicle for vindicating fundamental constitutional rights. Such a result, correct or otherwise, deserves more explanation than the Panel provided.

24

*Id.* at 3.

Again without explanation, the panel denied IJ's motion for leave to file its amicus brief. And again without explanation, it then denied the petitions for rehearing. Crucially, however, it revised its one-sentence rejection of plaintiffs' takings claims to make clear that it was rejecting them on the merits—and hence *with prejudice to refiling them anywhere*. Specifically, the panel deleted its previous reference to the district court's jurisdiction and replaced it with this: "Because we hold that the Fifth Amendment Takings Clause as applied to the [S]tates through the Fourteenth Amendment does not provide a right of action for takings claims against a [S]tate, we VACATE the district court's decision and REMAND for further proceedings." *Devillier v. Texas*, 53 F.4th 904 (5th Cir. 2023) (per curiam) (footnote omitted). The panel left unchanged its footnoted reference to a *Bivens* case and a Ninth Circuit decision from 1992. *See id.* at 904 n.1. And it again refused even to discuss a single one of the myriad Takings Clause cases or arguments proffered by the plaintiffs and the Institute for Justice.

## II.

This appeal should've begun and ended with the State's decision to remove to federal court under 28 U.S.C. § 1441. That's for two reasons.

First, the State's decision to remove obviously constitutes a waiver of its sovereign immunity. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613 (2002). In 2019, the Supreme Court held that federal takings plaintiffs are free to bring their claims in federal court in the first instance. *See Knick v. Township of Scott*, 139 S. Ct. 2162 (2019) (overruling *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985)). That decision created newfound attention on the question of whether States enjoy sovereign immunity against post-*Knick* takings claims. *See, e.g., Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454 (5th Cir. 2019). But cases

like *Bay Point* concern takings claims brought originally in federal court against *non-consenting* States. Regardless of whether the State can assert sovereign immunity when it's haled into federal court against its will for taking property, *Lapides* says the State cannot assert sovereign immunity after *the State* chooses the federal forum by filing a notice of removal.

Second, the State removed under § 1441 on the theory that plaintiffs' claims "arise under" federal law. But as Justice Holmes put it more than a century ago, "[a] suit arises under the law that creates the cause of action." *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916). That means, as a general matter, suits are removable under § 1441 *only* when federal law creates the cause of action:

> [A] federal court does not have original jurisdiction over a case in which the complaint presents a state-law cause of action. . . . For better or worse, under the present statutory scheme as it has existed since 1887, a defendant may not remove a case to federal court unless the *plaintiff*'s complaint establishes that the case "arises under" federal law. A right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action.

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 10–11 (1983) (quotations and footnote omitted).

Consider, for example, *Merrell Dow Pharmaceuticals v. Thompson*, 478 U.S. 804 (1986). In that case, the plaintiff brought a state tort action predicated on the allegation that a drug company violated a federal misbranding standard. The drug company tried to remove on the theory that the federal misbranding standard was an essential element to plaintiff's cause of action and obviously appeared on the face of the complaint. *See Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152–53 (1908). The Supreme Court held the action was not removable because to hold otherwise would

"flout" Congress's decision not to create a federal cause of action for such misbranding claims. *Merrell Dow*, 478 U.S. at 812. Because the State—and only the State—created the plaintiff's cause of action, the Court held the suit had to stay in state court. The fact that the entirety of the case was predicated on a federal misbranding standard was irrelevant.[1]

The State's decision to invoke § 1441 means one of two things must be true. First, federal law gives the plaintiffs a federal cause of action to litigate their federal takings claims, and hence the suit arises under federal law—as the State effectively conceded in its notice of removal. If that's true, the opinion written by the magistrate judge and adopted by the district court was correct and should be affirmed.

Second, and alternatively, federal law does not give plaintiffs a cause of action to litigate their federal takings claims—as the panel opinion concluded in its one-paragraph opinion. It's true, after all, that § 1983 does not supply a cause of action to sue the State under *Will*, and in the absence of another federal cause of action,[2] that might mean plaintiffs are left exclusively with state-law claims. In that case, however, the correct outcome

---

[1] There are exceptions to the rule that §§ 1331 / 1441 jurisdiction attaches only where the plaintiff raises a cause of action created by federal law. *See, e.g.*, *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005). *But see id.* at 320–21 (Thomas, J., concurring) (urging the Court to return to the simplicity of the *American Well Works* rule). The State, as the party invoking federal jurisdiction, has never urged such exceptions, however. *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019) ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived.").

[2] It's unclear that plaintiffs do not have another federal cause of action. For example, it's unclear why plaintiffs' demand for injunctive relief does not trigger our en banc holding that plaintiffs can use *Ex Parte Young* as a cause of action even when they cannot use § 1983. *See Green Valley Special Util. Dist. v. City of Schertz, Tex.*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc) (citing *Ex parte Young*, 209 U.S. 123, 149 (1908)). *But see id.* at 494 (Oldham, J., concurring) (questioning this holding).

is to remand plaintiffs' takings claims to state court because we have no arising-under jurisdiction to hear the claims. *See Franchise Tax Bd.*, 463 U.S. at 8 ("If it appears before final judgment that a case was not properly removed, because it was not within the original jurisdiction of the United States district courts, the district court *must* remand it to the state court from which it was removed." (emphasis added)).

The panel tried to follow this second route in its first opinion. It said: "[W]e VACATE the district court's decision *for want of jurisdiction* and REMAND with instructions to *return this case to the state courts*." *Devillier*, No. 21-40750, 2022 U.S. App. LEXIS 32519, at *1 (emphases added). But then the State reminded the panel that the "[a] long line of precedent makes clear that lack of a cause of action is not a jurisdictional defect." Texas Pet. for Reh'g at 5 (citing, inter alia, *Steel Co.* and *Bell v. Hood*). So the panel amended its decision to say:

[W]e VACATE the district court's decision ~~for want of jurisdiction~~ and REMAND ~~with instructions to return this case to the state courts~~ for further proceedings.

*Devillier*, 53 F.4th at 904. This second decision was thus a merits determination and hence a with-prejudice dismissal. *See Steel Co.*, 523 U.S. at 88–89.

But § 1441 precludes this disposition of the case. We cannot affirm the exercise of federal jurisdiction because plaintiffs' claims arise under federal law and then dismiss the claims with prejudice because plaintiffs' claims arise under state law. The panel's contrary holding means plaintiffs' claims are gone forever. *See, e.g.*, WRIGHT & MILLER, *supra*, § 4439 ("[D]ismissal for failure to state a claim precludes a second action that presents the same claim through a better complaint.").

The panel's decision is not just wrong, it also has staggering implications because it renders federal takings claims non-cognizable in any

court at any time ever. Under the old *Williamson County* regime, before *Knick* overruled it, plaintiffs were forced to litigate their federal takings claims in state court. And the only federal review a property owner could get was from the Supreme Court exercising its certiorari jurisdiction under 28 U.S.C. § 1257 to review the state court's treatment of the Takings Clause. *See San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323 (2005). Numerous plaintiffs took that route, sued their States in state court, and then obtained review in the Supreme Court under § 1257. *See, e.g.*, *Murr v. Wisconsin*, 137 S. Ct. 1933, 1941–42 (2017); *Stop the Beach Renourishment, Inc. v. Fla. Dept. of Env't Prot.*, 560 U.S. 702, 711–12 (2010); *Palazzolo v. Rhode Island*, 533 U.S. 606, 615–16 (2001); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1009–10 (1992); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 829–31 (1987).

The plaintiffs in this case attempted to litigate their claims in state court—just as the plaintiffs did in *Murr*, *Stop the Beach*, *Palazzolo*, *Lucas*, and *Nolan*. And obviously the plaintiffs didn't need a federal cause of action to do that; the state courts are full of litigants who do not have federal causes of action. And even without a federal cause of action, the plaintiffs could've litigated their federal takings claims all the way through the state court system and then gone to the Supreme Court of the United States under § 1257—just as the plaintiffs did in *Murr*, *Stop the Beach*, *Palazzolo*, *Lucas*, and *Nolan*. That's because the Supreme Court can exercise its § 1257 jurisdiction to review federal issues decided by state courts even if the petitioner lacks a federal cause of action and hence could not satisfy the inferior federal courts' arising-under jurisdiction. *See Penobscot Nation v. Ga.-Pac. Corp.*, 254 F.3d 317, 324 (1st Cir. 2001) (Boudin, C.J.) ("The Supreme Court is entitled to review a state-court decision that decides a federal issue even if the action is one that could not have been brought in a federal district court under statutory 'arising under' jurisdiction."). A Supreme Court certiorari petition

provides relatively little federal protection for a federal takings claim, which is one reason the Supreme Court overturned *Williamson County*. But at least it was something.

The panel decision reduces the Takings Clause to nothing. Think about what now happens when landowners in our Circuit have their property taken by the State. The landowner can try to bring a federal takings claim in state court; the State removes; the federal court must assert jurisdiction and dismiss the claim with prejudice under the panel's published decision in this case. Likewise if the landowner tries to bring suit originally in federal district court. So the landowner now has only two choices—both of which render the Takings Clause a dead letter. The landowner can abandon the federal claim and sue solely under state law in state court—as if the People never bothered to ratify the federal Takings Clause in the first place. Of course, as the Institute for Justice pointed out in its inexplicably rejected amicus brief, that does nothing for landowners in Louisiana because that State does not afford its citizens a state-law takings remedy. *See* IJ Amicus Br. at 9–10 (citing *Ariyan, Inc. v. Sewerage & Water Bd. of New Orleans*, 29 F.4th 226, 228 (5th Cir. 2022) ("[S]ince Louisiana courts lack the power to force another branch of government to make an appropriation, the prevailing plaintiff has no judicial mechanism to compel the defendant to pay. The plaintiff who succeeds in an action against a governmental unit thus becomes a supplicant, relying on the grace of the government to appropriate funds to satisfy her judgment." (quotation omitted))). A Louisiana landowner must instead "rely exclusively upon the generosity of the judgment debtor." *Ariyan*, 29 F.4th at 232 (quotation omitted). The landowner's only other alternative is to ask the Supreme Court to reverse us.

Finally, under the panel's decision, the federal Due Process Clause claims pending in federal district court fail too. After all, plaintiffs cannot use § 1983 to raise those claims either. So the panel has held that all of plaintiffs'

federal constitutional claims arise under federal law for purposes of allowing the State to remove but arise under state law for purposes of the merits. That is transparently wrong. And it requires dismissing all of plaintiffs' claims with prejudice to refiling anywhere *even if* the claims are correct on the merits.

## III.

Now let's talk about the merits. The State's position, adopted by the panel, is that claims under the Takings Clause can be raised *only* under § 1983. I am not sure how § 1983 and the Supreme Court's implied-rights-of-action cases apply in this area. But I am sure of three things: (A) the panel's decision reflects a deeply ahistorical understanding of takings litigation in our Nation; (B) the Supreme Court in *First English* specifically rejected the Solicitor General's contention that Takings Claims are actionable only under § 1983 or some other federal statutory cause of action; and (C) these issues plainly warranted *some* discussion in the panel's opinion—which ignored all of them.

## A.

At the Founding, it was clear that the Takings Clause afforded a remedy for uncompensated takings separate and apart from any statute. For example, in proposing the Takings Clause as part of the Bill of Rights, James Madison emphasized that federal courts would enforce the clause directly: "independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights . . . ." James Madison, *Amendments to the Constitution* (June 8, 1789), *in* 12 The Papers of James Madison 197, 207 (Charles F. Hobson et al. eds., 1979) [Madison Papers]; *see also* William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 794–95 & n.69 (1995); Douglas W. Kmiec, *The Original Understanding of the Taking Clause Is Neither Weak Nor Obtuse*, 88 Colum. L. Rev. 1630, 1660–61 & nn.158–61 (1988).

Thus in his famous essay, *Property*, Madison emphasized that the Constitution itself protected property owners from uncompensated takings:

> If there be a government then which prides itself in maintaining the inviolability of property; which provides that none shall be taken *directly* even for public use without indemnification to the owner, and yet *directly* violates the property which individuals have in their opinions, their religion, their persons, and their faculties; nay more, which *indirectly* violates their property, in their actual possessions, in the labor that acquires their daily subsistence, and in the hallowed remnant of time which ought to relieve their fatigues . . . such a government is not a pattern for the United States.

James Madison, *Property*, Nat'l Gazette (Mar. 27, 1792), *reprinted in* 14 Madison Papers, *supra*, at 266, 267–68.

Still, the Marshall Court held that the Takings Clause applied only to takings by the federal government and not to takings by the States. *See Barron v. Baltimore*, 32 U.S. (7 Pet.) 243, 250–51 (1833) (Marshall, C.J.). And even as to takings by the federal government, Congress chose to remedy them with "private" acts before the Civil War. *See* Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer, & David L. Shapiro, Hart & Wechsler's The Federal Courts and the Federal System 897 (7th ed. 2015) [Hart & Wechsler]. "While Congress was the forum for takings claims, it did not have discretion to deny takings claims mandated by the Takings Clause." Treanor, *supra*, at 794 n.69. Rather, early Congresses' approach to paying for taken property apparently derived from their views about sovereign immunity rather than any doubt that the Fifth Amendment, standing alone, required a just-compensation remedy for takings. Hart & Wechsler, *supra*, at 896–97. As the Supreme Court put it in citing cases going back to 1837:

> By this legislation congress seems to have assumed the right to determine what shall be the measure of compensation. But this is a judicial, and not a legislative, question. The legislature may determine what private property is needed for public purposes; that is a question of a political and legislative character. But when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry.

*Monongahela Navigation Co. v. United States*, 148 U.S. 312, 327 (1893) (citing, *inter alia*, *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. (11 Pet.) 420 (1837)).

And starting at the Founding, federal courts entertained suits arising from uncompensated takings by States. The first Congress enacted two statutes—the Process Acts of 1789 and 1792—that directed inferior federal courts to borrow common-law causes of action from the States where they sat. *See* Act of Sept. 29, 1789, ch. 21, 1 Stat. 93; Act of May 8, 1792, ch. 36, 1 Stat. 275; Anthony J. Bellia, Jr. & Bradford R. Clark, *The Original Source of the Cause of Action in Federal Courts: The Example of the Alien Tort Statute*, 101 Va. L. Rev. 609, 627–28 (2015). As a result, federal courts adjudicated a whole host of takings-related claims under various causes of action. *See, e.g.*, *Van Horne's Lessee v. Dorrance*, 2 U.S. (2 Dall.) 304, 310 (C.C.D. Pa. 1795); *Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. (7 Cranch) 603 (1812); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810); *Terrett v. Taylor*, 13 U.S. (9 Cranch) 43, 52 (1815); *Green v. Biddle*, 21 U.S. 1 (1823); *Bonaparte v. Camden & A.R. Co.*, 3 F. Cas. 821, 831 (C.C.D. N.J. 1830) (No. 1617); *Yates v. Milwaukee*, 77 U.S. (10 Wall.) 497, 507 (1870). Undoubtedly, federal courts played a "robust role in protecting property rights against states and local

encroachments well before the advent of the Fourteenth Amendment." Ann Woolhandler & Julia D. Mahoney, *Federal Courts and Takings Litigation*, 97 Notre Dame L. Rev. 679, 686 (2022).

It's unclear why Congress's enactment of § 1983 in 1871 could somehow strip federal courts of their powers to hear takings claims. *See* Woolhandler & Mahoney, *supra*, at 686–91. Between 1871 and the incorporation of the Takings Clause in 1897, federal courts continued to hear state takings claims without mention of § 1983. *See Pumpelly*, 80 U.S. 166; *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. (8 Otto) 403 (1878); *N. Transp. Co. v. City of Chicago*, 99 U.S. (9 Otto) 635 (1878); *Hollingsworth v. Parish of Tensas*, 17 F. 109 (C.C.W.D. La. 1883); *Pac. R.R. Removal Cases*, 115 U.S. 1, 5–6 (1885); *Chicago, Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 238–41 (1897) (incorporating the Takings Clause).

Post-incorporation, federal courts adjudicated these claims under the Constitution directly, and plaintiffs did not need to (nor did they) invoke § 1983. *See, e.g.*, *Village of Norwood v. Baker*, 172 U.S. 269, 277 (1898) ("The plaintiff's suit proceeded upon the ground, distinctly stated, that the assessment in question was in violation of the fourteenth amendment . . . . It has been adjudged that the due process of law prescribed by that amendment requires compensation to be made or secured to the owner when private property is taken by a state, or under its authority, for public use."); *Cuyahoga River Power Co. v. City of Akron*, 240 U.S. 462 (1916); *Del., L. & W.R. Co. v. Town of Morristown*, 276 U.S. 182 (1928); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926); *Dohany v. Rogers*, 281 U.S. 362 (1930).

The Court has not only entertained claims outside of the § 1983 cause of action, but it has also stated that Congress cannot render the Takings Clause unenforceable by failing to create an independent cause of action. As

the Court said one-hundred years ago in 1923, "[j]ust compensation is provided for by the Constitution and the right to it cannot be taken away by statute." *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 304 (1923). And as the Court specified in 1933:

> The suits were based on the right to recover just compensation for property taken by the United States for public use in the exercise of its power of eminent domain. That right was guaranteed by the Constitution. . . . The form of the remedy did not qualify the right. It rested upon the Fifth Amendment. Statutory recognition was not necessary. . . . The suits were thus founded upon the Constitution of the United States.

*Jacobs v. United States*, 290 U.S. 13, 16 (1933).

The Court affirmed the self-executing nature of the Fifth Amendment again and again throughout the twentieth century. *See, e.g.*, *First English Evangelical Lutheran Church of Glendale v. Los Angeles County, Cal.*, 482 U.S. 304, 315 (1987) (holding that the Fifth Amendment doesn't just create a right but "necessarily implicates the constitutional obligation to pay just compensation" in the event of a taking and that the "*self-executing character* of the constitutional provision*" bestows a landowner with a cause of action (quotation omitted) (emphasis added)); *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 5 (1984) (When ousted by the United States, "the owner has a right to bring an inverse condemnation suit to recover the value of the land on the date of the intrusion by the Government." (quotation omitted)); *United States v. Clarke*, 445 U.S. 253, 257 (1980) ("A landowner is entitled to bring such an [inverse condemnation] action as a result of the self-executing character of the constitutional provision with respect to compensation." (quotation omitted)); *Dickinson*, 331 U.S. at 748 ("But whether the theory of these suits be that there was a taking under the Fifth Amendment, and that therefore the Tucker Act may be invoked because it is

a claim founded upon the Constitution, or that there was an implied promise by the Government to pay for it, is immaterial. In either event, the claim traces back to the prohibition of the Fifth Amendment . . . ."); *United States v. Causby*, 328 U.S. 256, 267 (1946) ("If there is a taking, the claim is founded upon the Constitution . . . ." (quotation omitted)).

And if that wasn't enough, the Court gave us another reminder as recently as 2019. *See Knick*, 139 S. Ct. at 2171 ("Because of 'the self-executing character' of the Takings Clause 'with respect to compensation,' a property owner has a constitutional claim for just compensation at the time of the taking." (quoting *First English*, 482 U.S. at 315)). And *Knick* reaffirmed: "*Jacobs* made clear that, no matter what sort of procedures the government puts in place to remedy a taking, a property owner has a Fifth Amendment entitlement to compensation as soon as the government takes his property without paying for it." *Id.* at 2170.

B.

The State of Texas is not the first party to try this § 1983-or-bust approach to the Takings Clause. In *First English*, the United States filed an amicus brief on behalf of Los Angeles. *See* Brief for the United States as Amicus Curiae Supporting Appellee, *First English*, 482 U.S. 304 (No. 85-1199), 1986 WL 727420. It repeatedly argued that "the Constitution does not, of its own force, furnish a basis for a court to award money damages against the government," *id.* at *14, that "the Takings Clause is strictly prohibitory and does not, without further legislative action, mandate a monetary award against the government," *ibid.*, that the Takings Clause does not provide a remedy where state law does, *id.* at *25, that "the Takings Clause's prohibition of uncompensated takings does not imply a constitutionally-based compensation remedy," *id.* at *26, that "this Court has been reluctant to permit a cause of action in federal court directly under

the Fourteenth Amendment, unaided by congressional legislation," *id.* at *30, that "Congress's enactment of 42 U.S.C. 1983 has eliminated any need for this Court to explore implicit constitutional remedies to be applied against governmental bodies acting in the area of local land-use regulation," *id.* at *31, and that "[t]here is no occasion to resort to a federal remedy under Section 1983 where the state has made provision for the payment of compensation in an action for inverse condemnation in state court," *id.* at *32.

The Solicitor General pointed out that First English "*did not rely on 42 U.S.C. 1983* in the California courts; nor has it done so in this Court." *Id.* at *32 (emphasis added). The Solicitor General contended that this failure was fatal to the Court's ability to reach the merits of the takings issue because, in the Government's view, § 1983 was the sine qua non to both jurisdiction and the merits. *See id.* at *7–8 (arguing First English failed to plead a federal issue necessary for the Supreme Court's appellate jurisdiction); *id.* at *9 (emphasizing Court should "be reluctant" to reach the merits "where appellant declined to rely on 42 U.S.C. 1983"). In all but urging the Court to dismiss for lack of jurisdiction, the Solicitor General further argued that First English's failure to invoke § 1983 put the case in an "uninviting posture" and made it "far from a model of pleading practice." *Id.* at *9–10.

The Supreme Court was thus squarely presented with the question—in a case *where the takings plaintiff did not rely on § 1983*—whether that statutory cause of action is an indispensable prerequisite for recovering just compensation. And the Supreme Court emphatically held *no*. As most relevant here, the Court said:

> The Solicitor General urges that the prohibitory nature of the Fifth Amendment, combined with principles of sovereign immunity, establishes that the Amendment itself is only a

limitation on the power of the Government to act, not a remedial provision. *The cases cited in the text* [*including* Kirby, Causby, Seaboard Line, *and* Monongahela Navigation]*, we think, refute the argument of the United States that 'the Constitution does not, of its own force, furnish a basis for a court to award money damages against the government.'* Though arising in various factual and jurisdictional settings, these cases make clear that it is the *Constitution* that dictates the remedy for interference with property rights amounting to a taking.

*First English*, 482 U.S. at 316 n.9 (emphases added) (quoting Brief for the United States as Amicus Curiae Supporting Appellee, *supra*, at *14).

True, many plaintiffs invoke § 1983 to bring takings claims against defendants (like cities and counties) that are amenable to suit under that statute. After all, a § 1983 claim carries with it the promise of fees under 42 U.S.C. § 1988. And many of the defendants that take property are suable under § 1983. But the popularity of § 1983 claims does not imply that § 1983 is plaintiffs' *only* avenue for relief. Indeed, *First English* specifically rejected the State's (and the panel's) assertion to the contrary. And it would be surprising (to say the least) if Congress's enactment of § 1983—which *expanded* the remedies for constitutional violations—somehow *eliminated* plaintiffs' well-established rights, existing since the dawn of the Republic, to vindicate their federal rights against non-§ 1983 defendants (like States).

## C.

Takings litigation has a rich history in our Nation, separate and apart from any statute. And the Supreme Court has said that the Takings Clause provides a remedy to property owners, separate and apart from any statute. So if we're going to say that it's § 1983 or the (ahem) highway, we have an awful lot of explaining to do. Way more than the panel's one sentence. And all of the explanation in the world cannot justify holding that plaintiffs' federal takings claims are not cognizable in any court at any time.

The panel's disposition of this case is far worse than the bad-old days of *Williamson County*. The *Williamson County* regime made it impossible to bring suit in federal court against States (or any other defendant) for taking property in violation of the Takings Clause. Rather, the Court held that all federal takings claims must be brought in state court—subject to review, if at all, only in the Supreme Court on certiorari. *See Williamson County*, 473 U.S. at 194–97. The panel decision in our case appears to embrace that same result: Yes, plaintiffs who lost land alongside IH-10, you have a federal right under the Takings Clause, but no, it cannot be vindicated in the inferior federal courts.

But two points about this *Williamson-County*-revivified holding bear emphasis. First, the Supreme Court overturned *Williamson County* in *Knick*, and it's not our prerogative to say otherwise. *See Knick*, 139 S. Ct. at 2179. And second, the panel's decision is even worse than *Williamson County* because under today's decision, plaintiffs who sue in state court can have their cases removed and dismissed before *any* court *ever* passes on the merits.

IV.

Given the terseness of the panel's disposition, it's hard to know for sure what all went into its two decisions. It's also hard to know why the panel did not cite the Supreme Court's takings precedents, much less explain them away. Today, two members of the panel issue comparatively scopious opinions to defend the rejection of plaintiffs' claims. There are at least five problems with this *post hoc* approach (in addition to the others referenced above).

A.

First, the parties have a right to know why their claims are being adjudicated on the merits and barred from refiling in any court at any time. And they have a right to know that before their time for seeking rehearing

expires—to say nothing of the time for petitioning the Supreme Court for certiorari. But in this case the parties cross-moved for rehearing, a putative amicus sought to participate in rehearing, and all of the motions were denied before they had any understanding of *why*. What's worse, the plaintiffs *even had to file their petition for certiorari* before they had an explanation for why their claims were adjudicated on the merits and subjected to res judicata. *See* Petition for Writ of Certiorari, *Devillier v. Texas* (No. 22-913). And it is little comfort to say the plaintiffs had the panel opinion's lonely paragraph of explanation, which pales in comparison to what we offer (for example) in single-judge opinions for *pro se* litigants who request a certificate of appealability. *See, e.g.*, *Faye v. Vannoy*, No. 17-30809, 2018 WL 11446637, at *1 (5th Cir. Nov. 7, 2018).

## B.

Second, the most telling thing about today's concurring opinions is what they do *not* say. Neither offers a single word of explanation, rebuttal, or disagreement with Part II of this dissent. That is, our en banc court apparently agrees that (1) plaintiffs' claims arise under federal law for purposes of making them removable under 28 U.S.C. § 1441; (2) plaintiffs' claims nonetheless do not arise under federal law for purposes of the merits; and (3) plaintiffs' claims are forever barred from refiling anywhere.

## C.

Third, Judge Higginson says the panel footnoted a *Bivens* case because, in its view, this is a case about "implied cause[s] of action." *Ante*, at 9 (Higginson, J., concurring). But the fact that the Fourth Amendment does not specify a remedy for the illegal search-and-seizure of Webster Bivens doesn't say anything about the Fifth Amendment's very specific remedy for the unconstitutional taking of plaintiffs' land. And the Supreme Court has repeatedly admonished that takings claims—and plaintiffs'

entitlements to "just compensation"—exist independent of any statute. *See, e.g.*, *First English*, 482 U.S. at 315–16 & n.9; *Seaboard Air Line Ry.*, 261 U.S. at 304. The Court has never said anything even close to that about the Fourth Amendment. That's not to say plaintiffs are necessarily right. It's just to say that *Bivens* doesn't prove they're wrong.

Moreover, the panel's footnoted analogy to *Bivens* does nothing to confront one of the most profound truths in all of constitutional law and federal courts: "The constitutional text refers to only two remedies: (1) a right to just compensation for takings and (2) the privilege of the writ of habeas corpus." HART & WECHSLER, *supra*, at 330. That sets these two constitutional rights apart from others and at least suggests these two rights—even if not all others in the Constitution—have special protections against congressional abrogation or dereliction. *Cf. Battaglia v. Gen. Motors Corp.*, 169 F.2d 254 (2d Cir. 1948) (analyzing congressional effort to deny any forum, state or federal, to raise a constitutional claim). Indeed, the Court has held that the Constitution's protection for habeas corpus rendered invalid a congressional restriction on federal jurisdiction for habeas claims. *See Boumediene v. Bush*, 553 U.S. 723 (2008); HART & WECHSLER, *supra*, at 338 ("*Boumediene* is the only Supreme Court decision clearly holding that a congressional enactment restricting jurisdiction—in that case, of both federal and state courts—is unconstitutional."). Yet the panel's decision in this case denies any forum—state or federal—to the only other constitutionally guaranteed remedy of just compensation. So the monumental questions of constitutional law and federal courts posed by this case cannot be avoided by analogizing to *Bivens*.

And even if the cause of action is "implied," *Bivens* still is the wrong framework. *See ante*, at 11 n.1 (Higginson, J., concurring). The cause of action for takings claims pre-dated *Bivens* by over a hundred years and traces its

lineage all the way to the Founding. It therefore cannot be dismissed as "judicial genesis" of the same sort that begat *Bivens*. *Ibid*.

## D.

Fourth, Judge Higginson's reliance on *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020), is misplaced. That case involved a statutory right of action under the Tucker Act for takings claims against the federal government. *See id*. at 1331. But it said nothing about situations like this one where Congress does not enact a statutory cause of action. In fact, the Court *expressly declined* to decide whether plaintiffs could bring their claims under the Takings Clause because the Tucker Act provided them with just compensation: "Having found that the Risk Corridors statute is a money-mandating provision for which a Tucker Act suit lies, we need not resolve petitioners' alternative arguments for recovery based on an implied-in-fact contract theory or under the Takings Clause." *Id*. at 1331 n.15. And faced with no statutory cause of action in *First English*, the Court *did* decide that the Takings Clause provided an independent cause of action. *See* 482 U.S. at 315–16; *see* Part III.B, *supra*.

## E.

Fifth and finally, Judge Higginbotham suggests the panel referenced the Texas Supreme Court because it thinks federal takings claims are cognizable in Texas's courts but not ours. *Ante*, at 4 (Higginbotham, J., concurring). There are at least three problems with that.

First, as explained in Part II, *supra*, plaintiffs cannot relitigate their claims in state court. They have been adjudicated on the merits here. So the case is now over. And by exerting § 1441 jurisdiction, the panel has allowed States to remove federal takings claims from state court—thus empowering defendants to deprive plaintiffs of the state forum that Judge Higginbotham says would otherwise exist.

Second, the Supreme Court has repeatedly said that the Takings Clause guarantees plaintiffs just compensation regardless of whether States provide 100% relief in state court or under state law. *See, e.g.*, *Knick*, 139 S. Ct. at 2170–71; *First English*, 482 U.S. at 315, 316 n.9; *Jacobs*, 290 U.S. at 16; *Seaboard*, 261 U.S. at 304; *Chicago*, 166 U.S. at 233–41; *see also Palazzolo*, 533 U.S. at 615–17 (Supreme Court entertaining takings claim against a State based on the federal Constitution, not state statute); Woolhandler & Mahoney, *supra*, at 681 (indicating that between Reconstruction and the New Deal, federal courts commonly exercised federal question jurisdiction to hear takings claims). Moreover, even if the State of Texas would otherwise provide a remedy to Texans who sue in state court and somehow manage to avoid removal of their claims to federal court, the State of Louisiana does not. *See Ariyan*, 29 F.4th at 228. JUDGE HIGGINBOTHAM does not dispute that.[3]

And third, just because federal rights *can* be vindicated in state court, it does not follow that these rights *cannot* be vindicated in federal court. Under JUDGE HIGGINBOTHAM's contrary logic, we would be obligated to dismiss every single § 1983 claim we see because, after all, state courts must *always* be open to them. *See Haywood v. Drown*, 556 U.S. 729, 739–40 (2009) (holding that once a State creates a court of general jurisdiction, as all three of our States have, the State *must* hear and adjudicate § 1983 claims).

\* \* \*

Much more could be said about the evolution of the federal cause-of-action requirement from the Process Acts to *Ex parte Young* to § 1983 and the Takings Clause. Much more could be said about sovereign immunity and

---

[3] JUDGE HIGGINSON does dispute it, albeit in a footnote. *See ante*, at 15 n.5. But he does so only to dispute that *Ariyan* held what it held.

jurisdiction. And much more could be said about the principles of federalism—including, the need to balance federal protection for federal rights against the State's eminent domain powers, the State's power over property law, and the State's dignity as a sovereign in our federal system. It's a shame we're unwilling to consider these important issues en banc. And it's a shame that property owners in our circuit can no longer litigate Takings Clause claims in any forum, state or federal. I respectfully dissent.